Richard P. SULLIVAN

v.

EASCO CORPORATION et al.

Civ. No. S 86–1113.

United States District Court, D. Maryland.

June 16, 1987.

Shale D. Stiller, Jay I. Morstein, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiff.

Wilbur D. Preston, Richard J. Magid, Whiteford, Taylor & Preston, Baltimore, Md., and Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants.

SMALKIN, District Judge.

This Court, by Memorandum and Order dated March 23, 1987, granted the motion of plaintiff Richard P. Sullivan (Sullivan) for partial summary judgment on Count I of his complaint against Easco Corporation and associated parties (Easco).[1] *Sullivan v. Easco*, 656 F.Supp. 531 (D.Md.1987). Counsel for the parties agreed, following receipt of the March 23 opinion that (1) damages payable to Sullivan under Count I would be determined on the basis of a supplemental motion for summary judgment and response thereto, and (2) the Court, pursuant to Fed.R.Civ.P. 39(a)(1), would make any factual determinations necessary to decide the issue of Sullivan's damages. On April 16, Sullivan filed with the Clerk of the Court the requisite supplemental summary judgment motion. Easco opposed this motion in a timely fashion. Sullivan replied. It appears that no oral hearing is necessary in that there are no credibility determinations that need to be made, nor is there any other need for *viva voce* testimony.

The parties focus on two issues in this terminal phase of the litigation. First, they each have calculated their differing versions of the amount payable by Easco to Sullivan under the Employment Agreement between them. Second, they take opposing stands as to whether the doctrine of *res judicata* precludes Easco from contesting the validity of the Employment Agreement, as a defense independent from the matter ruled on in this Court's March 23 Memorandum Opinion. The Court will address each of these issues, and any pertinent subissues, *seriatim.*

I.

Sullivan has agreed to the applicability of certain parachute provisions in the Employment Agreement with Easco. Paper # 37, at 3. Specifically, Sullivan agrees to the applicability of a parachute payment cap derived from pertinent Internal Revenue Code (IRC) provisions. Having arrived at an "allowable cap" of $765,575 under these provisions, Sullivan voluntarily reduced the amount he seeks to $736,825[2] by deducting $28,750, the amount of a stock option payment to him by Easco pursuant to Plan 6, Grant 9. *Id.,* at 10–11. Sullivan argues, however, that this $736,825 figure should not be further decreased on the basis that he received compensation as President and Chief Executive Officer of Easco from January through June 1985. Paper # 37, at 6–10. He also argues that, in addition to being paid the aforementioned $736,825, he should be reimbursed for attorney's fees incurred by him in, and prejudgment interest accruing during, the prosecution of this case. Paper # 37, at 12–23. Easco agrees that the parachute provisions in the Employment Agreement are applicable, yielding the allowable cap of $765,575, and that the recoverable amount should be reduced to $736,825 to account for the stock option payment already made to Sullivan by Easco. Paper # 38, at 6. Easco vigorously

---

1. Count I of Sullivan's complaint alone remains for consideration. Sullivan and Easco have apparently reached an agreement as to Count IV. Sullivan has abandoned his claim under Count V of the complaint. Paper # 37, at 11. Sullivan's counsel will be instructed, by separate Order, to apprise the Court by letter as to whether counts II through V of Sullivan's complaint as well as Easco's counterclaim require any further ruling or whether the case may be closed on the basis of this Memorandum and the Order accompanying it.

2. Sullivan initially claimed that the recoverable amount was $736,826, not $736,825. He corrected this mathematical mistake in his reply. Paper # 39, at 2 n. 1.

asserts, however, that this $736,825 figure should be further decreased on account of the compensation paid Sullivan for the first six months of 1985. Easco also contests Sullivan's right to recover attorney's fees and prejudgment interest. Paper # 38, at 13–24. As noted, the parties agree on an allowable cap of $765,575 and the reduction therefrom yielding $736,825. The Court now, after briefly discussing the parachute provisions, will focus on what, in its view, are the three remaining subissues: (1) whether the agreed amount should be reduced to account for compensation received by Sullivan from Easco in 1985; (2) whether Sullivan should be reimbursed for attorney's fees and expenses; and (3) whether he, in addition, should be reimbursed for prejudgment interest.

## A.

As noted above, the damages recoverable by Sullivan from Easco are determined by reference to the Employment Agreement between them. Section 4.4 of the Employment Agreement limits the damages payable to Sullivan in accordance with the parachute provisions of §§ 280G and 4999 of the Internal Revenue Code of 1954 as amended (IRC). Specifically, § 4.4 of the Employment Agreement provides that:

> In the event that any of the amounts payable to the Executive [Sullivan] by the Corporation [Easco] ... would, if made, constitute Excess Parachute Payments for purposes of Sections 280G and 4999 of the Internal Revenue Code of 1954, as amended (after application of Section 280G(b)(4)), the amount payable by the Corporation shall be reduced by the amount necessary to cause the Executive to receive no Excess Parachute Payments.

Paper # 26, Exhibit A at 7. Section 280G of the IRC denies the corporate employer a deduction for excess parachute payments, while § 4999 imposes upon the employee thereof a 20% nondeductible excise tax on such payments. An excess parachute payment is defined as "the excess of any parachute payment over the portion of the base amount allocated to such payment." IRC § 280G(b)(1). A parachute payment means "any payment in the nature of compensation to (or for the benefit of) a disqualified person if—(i) such payment is contingent on a change—(I) in the ownership or effective control of the corporation, or (II) in the ownership of a substantial portion of the assets of the corporation, and (ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual which are contingent on such change equals or exceeds an amount equal to 3 times the base amount." [3] IRC § 280G(b)(2)(A). In plain English, the golden parachute provisions simply provide that any parachute payment over and above the "allowable cap," the figure equaling three times the base amount, is an excess parachute payment with consequent tax implications. The remaining subissues with respect to damages turn on whether or not a contested amount is or is not an excess parachute payment.

## B.

From January through June of 1985, Sullivan received approximately $127,508 for his services as President and Chief Executive Officer pursuant to the Employment Agreement with Easco. It is Easco's position that this compensation constitutes a parachute payment which should be deducted from the allowable cap. Paper # 38, 13–19. Sullivan disagrees. Paper # 37, at 6–10. The point of contention is whether the compensation was "contingent on a change of ownership or effective control of the corporation...." Easco argues that the compensation clearly was contingent on change of ownership or control of the corporation, given that any payment pursuant to an employment agreement entered into within a year before change of ownership or control is presumed to be contingent on such change. Paper # 38, at 14, *citing* IRC § 280G(b)(2)(C). Sullivan retorts that his compensation was not contingent on

---

**3.** The base amount is the amount of annualized taxable compensation payable over the five-year period preceding change of control.

change of ownership or control, but that, if it is presumed to be contingent on change of ownership or control, this presumption is overcome by clear and convincing evidence that the compensation was irrevocably paid prior to the change of ownership or control. Paper # 37, at 9–10.

Under the statute, the Court does not simply make a factual determination as to whether the compensation received by him from Easco was contingent on a change of ownership or control, under a preponderance standard. Rather, as pointed out by Easco, § 280G(b)(2)(C) governs, providing that:

> For the purposes of subparagraph (A)(i), any payment pursuant to ... an agreement entered into within 1 year before the change described in subparagraph (A)(i) ... shall be presumed to be contingent on such change unless the contrary is established by clear and convincing evidence.

Thus, the Court must determine whether the statutory presumption that Sullivan's compensation was contingent on change of ownership or control has been overcome by clear and convincing evidence.

There is little guidance as to what constitutes clear and convincing evidence that a payment is not contingent on change of ownership or control. The statute itself merely lays out the burden of proof. The 1984 Joint Committee Explanation sheds some light, stating:

> Whether the presumption can be rebutted will depend on the circumstances surrounding the execution of the contract, including what the contract provides and whether it was entered into at a time when a takeover attempt had commenced or the corporation otherwise viewed itself as a likely takeover candidate.

Paper # 37, *General Explanation of the Revenue Provisions of the Tax Reform Act of 1984* (December 31, 1984) at 202. The scant commentary extant, in a thoughtful discussion of the golden parachute tax provisions (to which this Court affords considerable weight) says this about the above-quoted portion of the 1984 Joint Committee Explanation:

A payment should not be considered contingent on a change of control if the payment is made prior to a change of control even if pursuant to a contract entered into within one year of a change of control. In the case of payments made prior to a change of control pursuant to a contract entered into within one year of a change of control, the irrevocable receipt of payment prior to the change of control would appear to constitute clear and convincing evidence sufficient to rebut the presumption that such payment was contingent on a change of control. An individual's receipt of benefits prior to a change of control which benefits can be retained even if the change of control never occurs is perhaps the best evidence that the payment is not contingent on a change of control.

Paper # 37, Siske, Freeman, Haber, Klein & Schewe, *Non-Qualified Executive Compensation Considerations For Executives of the Acquired Company*, Practicing Law Institute Series on Non-Qualified Executive Compensation (J. Phillip Adams, Chairman) (1986) at 18. This approach has the Siren allure of common sense about it.

█ The Court finds that Sullivan has overcome, by clear and convincing evidence, the presumption that his compensation for services rendered from January through June 1985 was contingent on a change of ownership or control. There is no dispute that he received contract payments for six months prior to the change of effective control. Taking a lead from the 1984 Joint Committee Explanation, this Court has considered the circumstances surrounding the execution of the Employment Agreement between Sullivan and Easco. It is undisputed that the Employment Agreement as a whole was entered into in contemplation of a takeover attempt by Equity Group Holdings (EGH). Indeed, this unanimously approved resolution appears in the Minutes of the Board of Directors Meeting held January 9, 1985:

> Resolved, That to assure that the principal officers and key executive employees of the Corporation and its subsidiaries are free to implement the decision of this

board regarding the Equity Group Holdings proposal without fear of reprisal in the event that there is a change in control of the corporation and to assure the continued availability of their services during this disruptive period, employment contracts substantially on the terms presented to this meeting shall be offered to those named on the schedule presented to this meeting, and a copy of the terms and schedule shall be attached to the minutes of this meeting.

Paper # 26, Exhibit B at 2–3.[4] This Court has also looked to the specific terms of the Employment Agreement as suggested in the 1984 Joint Committee Explanation. It is clear that the compensation received by Sullivan is not expressly made contingent on a change of ownership or control of Easco, specifically, a takeover of the corporation by EGH. Any conclusion that the paychecks received by Sullivan for services rendered in his capacity as President and Chief Executive Officer were contingent on a change of effective control must be implied. The circumstances surrounding Sullivan's receipt of compensation from Easco in early 1985 belie such implication.[5] As Sullivan states, "the fact that the compensation paid to Sullivan for services actually performed during the first six months of 1985, prior to a change of control, was irrevocable and could be retained by [him] even if the change of control never had occurred makes it absolutely clear that the payment was not contingent on the change of control." Paper # 37, at 9. It is further the case that Sullivan's base compensation figure for 1985 was arrived at by reference to a consultant's report utilized by Easco before, and without regard to, takeover events, Paper # 39, Exhibit A, and that, therefore, the compensation figure itself had an independent basis and was not solely a product of takeover events. That is, it appears that this Employment Agreement,

clearly entered into in view of imminent takeover, merely set terms regarding compensation for services rendered, actual receipt of which was in no way dependent on actual takeover. This Court is, thus, convinced that the compensation received by Sullivan for services rendered from January through June of 1985 was not contingent on a change of control in the statutory sense and hence should not be deducted from the allowable cap.

The Court notes that Easco provides an alternative explanation as to why the compensation received by Sullivan from Easco in early 1985 should be considered a parachute payment deductible from the allowable cap. The argument is, quite frankly, supportable only by a twisted reading of portions of the statute. Easco argues that:

> Section 280G makes specific provision for the treatment of amounts which represent "reasonable compensation for personal services actually rendered before the date of the change [of control] described in paragraph (2)(A)(i)." I.R.C. § 280G(b)(4)(B). Section 280G(b)(2)(A), which provides at clause (ii) for the determination of the 300% cap, states that "[f]or purposes of clause (ii), payments not treated as parachute payments under paragraph (4)(A), (5), or (6) shall not be taken into account." I.R.C. § 280G(b)(2)(A). Payments described by Section 280G(b)(4)(B), such as the 1985 Payments, are not excluded from treatment as parachute payments by any of these provisions, and are therefore included as part of the 300% cap.

Paper # 38, 15–16. This Court thinks it advisable to look to the exact wording of IRC § 280G(b)(4):

> Treatment of amounts which taxpayer establishes as reasonable compensation. —In the case of any [parachute] payment in paragraph [280G(b) ](2)(A)—

---

**4.** This resolution is printed in capitals in the Minutes of the Board of Directors Meeting.

**5.** Easco apparently believes that the above-quoted portion of the 1984 Joint Committee Explanation (re: rebutting the presumption that certain payments are contingent) is a limitation, that is, that the Court can consider only those

factors cited in the 1984 Joint Committee Explanation. This Court holds a contrary belief, viewing the factors cited in the 1984 Joint Committee Explanation as merely exemplary and the circumstances reviewed by Messrs. Siske et al. as also worthy of consideration.

(A) the amount treated as a parachute payment shall not include the portion of such payment which the taxpayer establishes by clear and convincing evidence is reasonable compensation for personal services to be rendered on or after the date of the change described in paragraph (2)(A)(i), and

(B) the amount treated as an excess parachute payment shall be reduced by the portion of such payment which the taxpayer establishes by clear and convincing evidence is reasonable compensation for personal services actually rendered before the date of the change described in paragraph (2)(A)(i).

Clearly, the only potentially applicable part of this provision is IRC § 280G(b)(4)(B), which does not itself determine what is or is not a parachute payment. Rather, § 280G(b)(4)(B) clearly states that, in the case of any *actual* parachute payment determined by reference to 280G(b)(2)(A), the amount treated as an *excess* parachute payment will be reduced by what is clearly and convincingly established to be reasonable compensation for personal services actually rendered before the date of change of ownership or control. Actual and excess parachute payments are two different things, and any parachute payment must perforce be actual before it can be excess. Because the compensation received by Sullivan between January and June of 1985 clearly was not an *actual* parachute payment, § 280G(b)(4)(B) does not even come into play. The Court thus reaffirms its conclusion that the compensation received by Sullivan in early 1985 was not a parachute payment deductible from the allowable cap.

### C.

#### 1.

In connection with litigation of this case, Sullivan has incurred attorney's fees and expenses allegedly totalling $140,025. Sullivan argues that these fees and expenses, payable by Easco to Sullivan under § 5 of the Employment Agreement, are in addition to the allowable cap. Paper # 37, at 12–16. Easco disagrees. Paper # 38, at 19–24.

As Sullivan notes, attorney's fees are not generally recoverable by the successful party in a lawsuit. Paper # 37, at 12. However, Maryland law provides that "[t]he result is otherwise, however, when the payment [of attorney's fees] is provided for by contract . . . ." *Addressograph-Multigraph Corp. v. Zink*, 273 Md. 277, 288–89, 329 A.2d 28, 35 (1974). The contract herein, *i.e.*, the Employment Agreement, provides, in § 5 entitled "Legal Costs," that:

If the Corporation shall fail to pay or provide payment of any amounts required to be paid or provided for hereunder at any time, the Executive shall be entitled to consult with independent counsel, and the Corporation agrees to pay the reasonable fees and expenses of such counsel for the Executive in advising him in connection therewith or in bringing any proceedings, or in defending any proceedings, involving the Executive's rights under this Agreement, such right to reimbursement to be immediate upon the presentment by the Executive of written billings of such reasonable fees and expenses. The Executive shall be entitled to the prime rate of interest established from time to time at the First National Bank of Maryland for any payments of such expenses, or any other payments under this Agreement, that are overdue.

Paper # 26, Exhibit A at 8. This Court will thus focus on the following question: Do attorney's fees and expenses, properly documented, constitute parachute payments, thus making them includible in the allowable cap?

Sullivan argues that attorney's fees and expenses escape characterization as parachute payments primarily because these fees and expenses are not "in the nature of compensation." Paper # 37, at 12–16. Easco vehemently disagrees. Paper # 38, at 19–23.

As with the phrase "contingent on a change of control," the phrase "in the nature of compensation" has not been extensively interpreted. The statute itself does not define the phrase. The 1984 Joint

Committee Explanation merely notes that "in the nature of compensation" includes, for example, "ordinary income with respect to stock options." Paper # 37, *General Explanation of the Revenue Provisions of the Tax Reform Act of 1984* (December 31, 1984) at 200.

Because of the apparent lack of definition of the phrase "in the nature of compensation," the parties individually attempt to define the phrase, to some extent by analogy. Sullivan first argues from common sense, however, that:

> Attorneys' fees are payable by Easco to Sullivan in this action solely by reason of the fact that Easco has repudiated and breached its contractual obligations, requiring Sullivan to litigate his entitlement to these benefits. In no way should payment of attorneys' fees and expenses be considered as parachute payments in the nature of compensation solely because such fees, necessitated by Easco's breach, are recoverable under the Employment Agreement.

Paper # 37, at 12–13. Sullivan then posits that the term "wages" is essentially synonymous with the phrase "in the nature of compensation," and that, because "wages," for federal employment withholding tax purposes, do not include attorney's fees and expenses (or interest, for that matter) incurred in connection with a back pay claim, "in the nature of compensation" similarly should not be interpreted as including such fees and expenses. Paper # 37, at 13–15. *See also* Rev.Rul. 80–364, 1980–2 C.B. 294 (The Internal Revenue Service there stated that "only the back pay award [not attorney's fees or interest] ... is wages for federal employment tax purposes. The payments for interest and the attorney's fees are not wages, because they are not remuneration for employment.") Easco accuses Sullivan of a "strained use of analogy," arguing that the phrase "in the nature of compensation" is distinct from, and broader than, the term "wages." Paper # 38, at 20. Easco instead relies upon the definition of gross income in IRC § 61 and the inclusion of "compensation" therein. *Id.*, at 20–21. Section 61(a) of the IRC indicates that gross income includes "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items." Easco points to language in the case law to the effect that compensation, so exemplified, covers "any economic or financial benefit conferred in any form on the employee unless it is specifically exempted by another section of the Code." Paper # 38, at 20, *citing Wheeler v. United States*, 768 F.2d 1333, 1335 (Fed.Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986).[6] Easco alerts the Court that the very cases cited by Sullivan specifically hold that gross income (though concededly not wages) includes not only back pay but also attorney's fees and interest incurred in connection therewith. Easco reasons therefrom that "[p]ayment of Sullivan's attorneys' fees by Easco—his former employer—pursuant to a provision of the Golden Parachute would unquestionably be an economic benefit to him and thus 'in the nature of compensation.'" *Id.*

This Court is not inclined to rely on either of the analogies drawn by the parties.[7] The Employment Agreement herein limits damages payable to Sullivan in accordance with the parachute provisions of §§ 280G and 4999 of the IRC. Paper # 26, Exhibit A at 7. It thus appears to the Court that it would be wise to construe the phrase "in the nature of compensation" (an element of any parachute payment and, hence, any excess parachute payment) in keeping with the Congressional purpose of, and the scant legislative comment on, the aforementioned parachute provisions themselves.

---

**6.** Easco further quotes from *Commissioner v. Lo Bue,* 351 U.S. 243, 247, 76 S.Ct. 800, 803, 100 L.Ed. 1142 (1956), wherein the Supreme Court stated that "[w]hen assets are transferred by an employer to an employee to secure better services they are plainly compensation." *Id.,* at 21.)

**7.** This case involves neither a question of what items should be excluded for federal employment withholding tax purposes nor a question of what items should be included in gross income calculation.

In 1984, Congress noted that "there had been a large volume of activity involving acquisitions of corporations by other taxpayers," and that "arrangements were often made to provide substantial payments to top executives and other key personnel of the target corporation in connection with any acquisition that might occur." Paper #37, *General Explanation of the Revenue Provisions of the Tax Reform Act of 1984* (December 31, 1984) at 199. Congress feared that these "golden parachutes" might tend "to discourage potential buyers from becoming interested," and "to encourage the executives and other key personnel involved to favor a proposed takeover that might not be in the best interests of the shareholders or others." *Id.* Congress thus decided to dissuade parties from entering into golden parachute contracts by prohibiting a deduction for excess parachute payments made by corporate employers and by imposing a 20% nondeductible excise tax for excess parachute payments received by employees. *Id*, at 200.

█ It appears to this Court that the purpose of the golden parachute tax provisions would not be served by construing "in the nature of compensation" as including attorney's fees and expenses. These items are obviously not in the nature of substantial payments to executives contracted for with the intent of blocking takeover attempts, the activity that Congress wished to discourage. Rather, they are simply reimbursement for expenditures necessitated by a breach of an employment contract. Such reimbursement by no means secures better services from the employee. By the time of breach, the relationship between corporation and employee has obviously been severed (and has probably soured), and no services of any quality by the employee will be forthcoming. It is further the case that "Legal Costs" provisions similar to the one herein appear in all sorts of contracts, employment and otherwise, as bargained-for risk allocations, thus indicating that they have independent utility and currency whether or not there is an impending takeover attempt. For these reasons, this Court finds that Sullivan is indeed entitled to an award of attorney's fees and expenses under his Employment Agreement with Easco, and that such fees are in addition to the allowable cap, given that they are not parachute payments.

### 2.

█ The Court must next determine what amount of attorney's fees and expenses, if any, should be awarded to Sullivan in connection with this litigation concerning the Employment Agreement. In this diversity case, the Court must follow Maryland law governing the determination of reasonable attorney's fees and expenses provided for by the contract. *See Federal Dep. Ins. Corp. v. Anorek,* 643 F.2d 164 (4th Cir.1981). The Court of Special Appeals of Maryland has stated that, "when the fee provision in the note is not explicit, but merely designates a 'reasonable attorney's fee,' ... the court in which suit is filed has the right to determine what is a reasonable fee." *Mortgage Inv. of Wash. v. Citizens Bk. & Tr. Co. of Md.,* 29 Md. App. 591, 596, 349 A.2d 647, 651 (1976), *aff'd* 278 Md. 505, 366 A.2d 47 (1978). No detailed procedure for determining such fee has been outlined by the Maryland courts. *Compare Barber v. Kimbrells, Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), *citing Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 714–19 (5th Cir.1974). The Court of Appeals of Maryland has cautioned, however, that the amount of attorney's fees and expenses awarded should not be left "to the option or the conscience of the attorney." *Johnson v. Phillips,* 143 Md. 16, 26–27, 122 A. 7, 11 (1923). *See also Mortgage Inv. of Wash. v. Citizens Bk. & Tr. Co. of Md.,* 29 Md.App. at 596, 349 A.2d at 651. It thus appears that the party requesting attorney's fees and expenses must offer some documentation of the hours worked, and an explanation of how the time was spent, and that the Court, under Maryland law, independently fixes the amount of a reasonable fee.

Sullivan seeks to recover $130,000 for attorney's fees and $10,025 for expenses incurred through final judgment at the trial

court level in this case, relying upon the above-quoted "Legal Costs" provision in the Employment Agreement. Paper # 37, 16–21. The $130,000 figure includes $118,-000 for the time actually expended to litigate this case thus far and $22,000 for the time presumably required to file a reply memorandum, prepare for argument, and attend to housekeeping matters. *Id.*, at 16. In support of his request, Sullivan, in the supplemental motion for summary judgment itself, outlines the hours spent and basic services rendered by the various partners and associates with the law firm of Frank, Bernstein, Conaway & Goldman, which represents him in the instant case. *Id.*, at 17–19.[8] Easco argues, in its opposition, that "Sullivan has not made an adequate record upon which such an award can properly be based," citing a federal case. Paper # 38, at 24.

This Court does not agree that Sullivan has not met his burden of documentation under Maryland law which, once again, is applicable in a diversity case such as this one. However, the Court notes that any possible inadequacy in Sullivan's documentation has been remedied by the submission of a computer printout, as well as a letter dated June 9, 1987 from Jay Morstein, Esquire (representing Sullivan) to Richard Magid, Esquire (representing Easco), detailing the time charges. Paper # 39, Exhibit B. For example, Easco argues, in its response, that "[a]lthough the attorneys' time charges summarized in Sullivan's brief total $93,777, Sullivan asks for $130,-000 in legal fees." Paper No. 38 at 24. The Court notes, in the first instance, that Sullivan states in his supplemental memorandum for summary judgment that "[t]he sum total of the hours and hourly rates attributable to [other] associates and paralegals make up the difference between the total time and time value devoted to date less the time value attributable to the persons identified by name above." Paper # 37, at 19. However, in the event that this explanation alone is inadequate, the computer printout identifying persons in

addition to the initially named ones involved in the litigation of the case, as well as the hours spent, and fees incurred by them adequately accounts for the additional $36,223 requested. *See* Paper # 39, Exhibit B at 1669, 1670, 1675, 1676, 1677, 1680, 1681, and 1682. Mr. Magid, in a June 4, 1987, letter to Mr. Morstein, expressed the view that, despite the submission of the computer printout, Sullivan's burden of documentation has not been met. In an abundance of caution, Mr. Morstein submitted a letter essentially summarizing the pertinent parts of the computer printout and providing some additional information. Mr. Morstein listed the attorneys involved (aside from those mentioned in Paper # 31), the fee incurred, and the basic services rendered. He thereby specifically accounts for $30,159.50 of the additional $36,223 requested. This Court accepts Mr. Morstein's representation that the remaining $6,063.50 is attributable to other service providers, each of whom's fee equals less than $300. Clearly, Sullivan has satisfied his burden of documentation with respect to attorney's fees. With respect to the expenses claimed, Easco's only objection appears to be that the $6,000 claimed for the fee paid to Jaffe & Associates "to evaluate Sullivan's pension and benefits rights" is not recoverable, given that Sullivan eventually abandoned these rights. This Court finds that the $6,000 fee is indeed recoverable, because Sullivan for sometime vigorously and reasonably pursued the pension and benefits under the contract, even though he eventually abandoned his pursuit of these benefits. Being very familiar with this case, the Court is thus convinced that the total amount requested—$140,025—reflects attorney's fees and expenses reasonably charged by Frank, Bernstein, Conaway & Goldman in connection with advising Sullivan with respect to, and prosecuting his claims under, the Employment Agreement litigated herein. The Court notes that $140,025 is a reasonable fee, especially in light of the

---

**8.** The approximate hourly fees charged by each partner and associate are readily ascertainable from the aforementioned information.

novel and complex legal issues raised and addressed in this case.[9]

For the aforementioned reasons, plaintiff Sullivan's request for attorney's fees and expenses will be, by separate order, *granted in toto, i.e.,* for $140,025.

### D.

#### 1.

Given Easco's failure, to date, to make the requested lump sum payment to Sullivan pursuant to the Employment Agreement, a question arises as to the propriety of awarding prejudgment interest herein. Sullivan contends that prejudgment interest on the overdue payment is provided for by § 5 of the Employment Agreement as well as by Maryland law, and that the applicable interest rate is 8½%. Paper # 37, at 21–24. Easco retorts that prejudgment interest is not recoverable under the Employment Agreement or Maryland law generally.[10] Interestingly, Easco does not argue that § 5 of the Employment Agreement fails to provide for prejudgment interest in the event of overdue payments, but, rather, that "[p]ayment of prejudgment interest pursuant to the Golden Parachute would be a 'parachute' payment subject to the 300% cap." Paper # 38, at 25. As with attorney's fees and expenses, the parties join issue with respect to whether a payment (interest, here) is "in the nature of compensation," a necessary element of any parachute payment. Sullivan again argues that "the analogy to 'wages' ... is a more appropriate analogy than the gross income analogy argued for by Easco because ... interest became payable, not as employee benefits, but as consequential damages of Easco's breach of the Employment Agreement." Paper # 39, at 8. Easco, again, vehemently disagrees. Paper # 38, at 24–29.

■ The Court finds, not by reference to the aforementioned analogies, but by reference to the above-discussed purpose of, and legislative comment on, the golden parachute tax provisions, that prejudgment interest is not a payment "in the nature of compensation," and that it, thus, is not a parachute payment includible in the allowable cap. An award of prejudgment interest to Sullivan would not be the type of substantial payment to an executive or key employee of a target corporation designed to block a possibly desirable takeover attempt and, thus sought to be discouraged by Congress. Such interest is recoverable only when the substantial payments which Congress actually viewed as evil—severance payments, bonuses, fringe benefits—are not made by the corporation in a timely fashion. By its very nature, then, prejudgment interest is reimbursement for the delay of payment. It is not, quite simply, a payment "in the nature of compensation," and it, therefore, is not a parachute payment includible in the allowable cap. (Given that the Court finds Sullivan entitled to prejudgment interest on overdue payments under § 5 of the Employment Agreement, there is no need to address the argument that Sullivan is entitled to the same prejudgment interest award under general Maryland law.

#### 2.

Sullivan has suggested an applicable interest rate of 8½%, Paper # 37, at 23–24, a rate with respect to which Easco has raised no objection. Sullivan begins by noting that § 5 of the Employment Agreement itself states that any payment due Sullivan which is not paid in a timely fashion shall bear interest at "the prime rate of interest established from time to time at the First National Bank of Maryland...." *Id.* Referring to a letter from a First National Bank officer setting forth the various prime rates of interest charged by the bank from July 1, 1985 through April 10, 1987, Sullivan suggested that the average prime rate during this time period was 8½%. *Id.,*

---

9. A few examples will suffice: Section 2–419 of the Maryland Corporations and Associations Code Annotated had not been previously construed by this Court or any Maryland court. The Internal Revenue Code provisions concerning golden parachute contracts are relatively new and lack a body of judicial construction.

10. Easco does not discuss what interest rate is applicable herein.

at 24.[11] The Court agrees that this 8½% rate of interest is an appropriate one to apply in this case. Multiplying the amount due Sullivan on July 1, 1985—$736,826—by 8½% results in total prejudgment interest of $125,260.[12]

This Court will, by separate order, grant prejudgment interest in that amount of $125,260.

## II.

Sullivan has requested that this Court reconsider the *res judicata* argument raised in his reply memorandum supporting his initial motion for partial summary judgment. *See* Paper # 32. He incorporates that argument in his supplemental motion for partial summary judgment, by reference. Paper # 39, at 25. By way of its opposition to Sullivan's supplemental motion for partial summary judgment, Easco has argued against the applicability of the doctrine of *res judicata* here because (1) Sullivan failed to raise the doctrine as an affirmative matter, and, therefore, has waived it, and (2) at any rate, the elements of *res judicata* are not present. Paper # 38, at 29.

Easco first argues that *res judicata* is not properly before the Court, given that unless *res judicata* is pled as an affirmative defense pursuant to Fed.R.Civ.P. 8(c), it is waived. Paper # 38, at 30–31. This argument is totally without merit because plaintiff Sullivan offensively raises the doctrine of *res judicata* as a ground for precluding defendant Easco from contesting the validity of the Employment Agreement, and Rule 8(c) is not applicable in this situation. The Court will thus focus on whether the elements of *res judicata* are present here.

The factual basis for Sullivan's assertion that Easco is barred from contesting the validity of the Employment Agreement is as follows: Easco sued EGH in the United States District Court for the District of Maryland, in Civil No. HM 85–75, during the course of the 1985 takeover battle between the two companies. Paper # 32, at 23, *citing* Exhibit C. Easco claimed violations of an assortment of provisions found in the Securities Exchange Act, 15 U.S.C. § 78a *et seq.* (1934). Paper # 32, Exhibit C. EGH responded by filing a counterclaim against not only Easco, but also against Sullivan and other directors. Paper # 32, Exhibit D. In the counterclaim, EGH alleged that Easco and its directors had engaged in illegal acts under the Securities Exchange Act, including the approval of certain employment contracts. The parties entered a stipulation and order of dismissal as to the entire action in May 1985. Paper # 32, Exhibit F.

■ The Supreme Court has stated that, "[u]nder *res judicata* doctrine, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). A three-pronged test thus must be satisfied before *res judicata* can be applied. First, there must be a final judgment on the merits. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4432 (1981), *citing G. & C. Merriam Co. v. Saalfield*, 241 U.S. 22, 28–29, 36 S.Ct. 477, 479–80, 60 L.Ed. 868 (1916). Second, the causes of action in the suits must be identical. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* at § 4406, *citing Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 319, 47 S.Ct. 600, 601, 71 L.Ed. 1069 (1927) and *Cromwell v. County of Sac*, 94 U.S. 351, 352–353, (4 OHo), 24 L.Ed. 195 (1877). Third, identity of parties is required if *res judicata* is to be applied. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction*, at 4448. Sullivan has failed to con-

---

11. According to Sullivan, given that he demanded his lump sum severance payment on June 25, 1985, he should have received it by July 1, 1985. April 10, 1987 is the date of the letter from the First National Bank officer. *Id.*

12. The Court notes that Sullivan actually requested $13 5,260, not $12 5,260. *See* Paper # 37, at 24. He made a mathematical mistake. Multiplying $736,825 by 8½% for a two-year period yields $125,260.

vince this Court that the three-pronged test is satisfied here.

 At the outset, the Court recognizes that the stipulation of dismissal with prejudice constitutes a final judgment on the merits for the purpose of *res judicata* (claim preclusion) though not for the purpose of collateral estoppel (issue preclusion).[13] *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 327, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955). *See also* C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* at § 4443. *Res judicata* requires, however, that both suits involve the same causes of action. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* at § 4406, and citations therein. Two causes of action are deemed the same for the purposes of *res judicata* only if the same evidentiary facts would support both actions. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* at § 4407. *See also Back Creek Indus., Inc. v. Alcon Constr., Inc.,* 631 F.2d 75, 78 (5th Cir.1980). The "same evidence test" has been thus stated in *Freeman on Judgments,* 5th Ed., Vol. 2, § 687, quoting in part from *Kiniry v. Davis,* 82 Okl. 211, 200 P. 439 (1921):

> "The cause of action is the same when the evidence will support both actions; or, rather the judgment in the former action will be a bar, provided the evidence necessary to sustain the judgment for the plaintiff in the present action would have authorized a judgment for him in the former." *If this identity of evidence is found, it will make no difference that the form of the two actions is not the same.*

(emphasis in the original). It is clear that the same evidentiary facts would not support both the 1985 suit, wherein both the principal claim and the counterclaim alleged violations of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, and this suit, wherein the claim alleges breach of contract and similar acts. The Court thus finds that *res judicata* is inapplicable here,

because the causes of action are not identical.

The Court additionally notes that *res judicata* is inapplicable here, because the requisite identity of parties is lacking. As co-parties in the 1985 suit, Easco and Sullivan are bound here only by the determination of issues that they in fact litigated as adversaries. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* at § 4449, *citing Restatement Second of Judgments* § 38 (1981). *See also Otis Elevator Co. v. Kass Realty Co.,* 353 F.2d 674 (4th Cir.1965).

For the aforementioned reasons, plaintiff Sullivan's supplemental motion for summary judgment as to Count I of his complaint, based upon the doctrine of *res judicata,* is *denied.*

### III.

Finding no just reason for delay, this Court will, by separate Order, expressly direct the entry of final judgment as to Count I of plaintiff Sullivan's complaint. Fed.R.Civ.P. 54(b). Plaintiff Sullivan's counsel will be instructed to apprise the Court, within 7 days of this Memorandum and the Order, as to whether or not final judgment may likewise be entered as to Counts II through V of plaintiff Sullivan's Complaint and as to defendant Easco's counterclaim. Defendant Easco will have 7 days thereafter to respond.

### ORDER

For the reasons stated in the foregoing Memorandum, IT IS this 16th of June, 1987, by this Court, ORDERED:

1. That plaintiff's supplemental motion for summary judgment BE, and the same hereby IS, GRANTED in part and DENIED in part;

2. That plaintiff's supplemental motion for summary judgment as to damages to be awarded under Count I BE, and hereby IS, GRANTED in part, by awarding him $736,825 for a lump sum severance payment, $140,025 for attorney's fees and ex-

---

**13.** Easco apparently accepts this legal conclu-

sion. Paper # 38, 31–32.

penses, and $125,260 for prejudgment interest, that is, $1,002,110 in total;

3. That plaintiff's supplemental motion for summary judgment with respect to Count I on the basis of *res judicata* BE, and the same hereby IS, DENIED;

4. That the Clerk of the Court is expressly directed to enter final judgment with respect to Count I of plaintiff's complaint, given this Court's express determination that there is no just reason for delay;

5. That plaintiff's counsel is instructed to apprise the Court, within 7 days of the aforementioned Memorandum and of this Order, as to whether or not final judgment may also be entered with respect to Counts II through V of plaintiff's complaint and with respect to defendants' counterclaim. Defendants have 7 days thereafter to respond.