**KENTUCKIANS FOR THE COMMONWEALTH, INC., Plaintiff,**

v.

**Colonel John RIVENBURGH, Colonel, District Engineer; Robert B. Flowers, Lieutenant General, Chief of Engineers and Commander of the U.S. Army Corps of Engineers; and Michael D. Gheen, Chief of the Regulatory Branch, Operations and Readiness Division, U.S. Army Corps of Engineers, Huntington District, Defendants,**

and

**Kentucky Coal Association, Pocahontas Development Company, and AEI Resources, Inc., Intervenor–Defendants.**

No. CIV.A.2:01–0770.

United States District Court,
S.D. West Virginia.
Charleston Division.

June 17, 2002.

Joseph M. Lovett, Esq., John W. Barrett, Esq., Lewisburg, Joe F. Childers, Esq., Lexington, KY, James M. Hecker, Esq., Trial Lawyers for Public Justice, Washington, DC, for Plaintiff.

Michael L. Keller, Esq., Kasey Warner, Esq., United States Attorney, United States Attorney's Office, Charleston, Ruth Ann Storey, Esq., U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, Terry Clarke, Esq., U.S. Army Corps of Engineers, Office of Counsel, Huntington, Steven E. Rusak, Esq., John C. Cruden, Esq., Jon M. Lipshultz, Esq., Thomas L. Sansonetti, Esq., U.S. Depart-

ment of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Russell W. Petit, Esq., U.S. Army Corps of Engineers, Office of Chief Counsel, Washington, DC, for Corps Defendants.

W. Henry Lawrence, IV, Esq., Robert D. Pollitt, Esq., Ancil G. Ramey, Esq., Richard L. Lewis, Esq., Steptoe & Johnson, Charleston, for Defendant–Intervenor Pocahontas Development Company.

Richard J. Bolen, Esq., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, Timothy J. Hagerty, Esq., Amy D. Cubbage, Esq., Frost, Brown, Todd LLC, Louisville, KY, for Defendant–Intervenor AEI Resources, Inc.

Robert G. McLusky, Esq., James R. Snyder, Esq., Lindsey K. Griffith, Esq., Jackson & Kelly, Charleston, for Defendant–Intervenor Kentucky Coal Association.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the motions of the Defendants, officers of the Army Corps of Engineers ("Corps"), and Intervenor–Defendants (together "Movants") for a stay pending appeal and for clarification of the Court's injunction order of May 8, 2002. Also pending are motions by Plaintiff for further injunctive relief and by Intervenor–Defendant Kentucky Coal Association to dismiss for failure to join a necessary party or, alternatively, to transfer venue.

## I. BACKGROUND

Early in 2002 the parties cross-moved for summary judgment on *Count* One,

which complained the Corps' issuance of Clean Water Act ("CWA") § 404 permits for valley fills to dispose of waste violated the Corps' own regulations, the CWA, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2), because the actions were arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. Following examination of the legislative history and statutory language of the CWA, the longstanding regulations of the Corps and the Environmental Protection Agency ("EPA"), interagency agreement concerning § 404 permit approval under the Resource Conservation and Recovery Act, and relevant provisions of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), the Court concluded approval of § 404 permits solely for waste disposal[1] was contrary to law and *ultra vires*. *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 204 F.Supp.2d 927, 941 (S.D.W.Va.2002)("May 8 Opinion").

In § 404, Congress intended to maintain the dredge and fill permit program previously authorized under § 10 of the Rivers and Harbors Act of 1899. *Id.* 204 F.Supp.2d at 934–35. While waterway dredging and dredged spoil disposal were permitted under the § 404 program, disposal of other pollutants was regulated under § 402. *Id.* at 935. Under the previous Corps program, continued by § 404, fills had a constructive primary purpose and were not allowable solely for disposal of waste. Congress clarified this understanding in 1977 when it amended § 404 of the CWA to require:

> Any discharge of dredged or fill material into the navigable waters *incidental to any activity having as its purpose bringing an area of the navigable wa-*

1. Disposal of dredged spoil was excepted. *Kentuckians for the Commonwealth, Inc. v.* *Rivenburgh,* 204 F.Supp.2d 927, 933–34 (S.D.W.Va.2002).

*ters into a use to which it was not previously subject,* where the flow or circulation of navigable waters may be impaired or the reach of such waters reduced, shall be required to have a permit under this section [404].

33 U.S.C. § 1344(f)(2). Section 404 permits are issuable for fills devoted to some useful purpose, "a use to which [the area] was not previously subject." *Id.*

After reviewing Defendants' arguments in support of § 404 permits for valley fill waste disposal, the Court concluded permitting § 404 fills solely to dispose of waste is "contrary to the spirit and the letter of the Clean Water Act." *Id.* 204 F.Supp.2d at 946. The Court then ruled:

> The Corps Defendants are ENJOINED from issuing any further § 404 permits that have no primary purpose or use but the disposal of waste. In particular, issuance of mountaintop removal overburden valley fill permits solely for waste disposal under § 404 is ENJOINED." *Id.*

## II. PERMANENT INJUNCTION

Movants request various clarifications of the May 8 injunction. They also object the injunction is overbroad and was issued without necessary factual findings. The Court will consider the Movants' requests for clarification, set out the standard for permanent injunctions and test the injunction as moulded.

### A. No Nationwide Scope

■ Movants question whether the injunction has nationwide application, and object it should not. Two of the three Corps Defendants (Rivenburgh, Gheen) are before the Court because they issue § 404 permits in the Corps' Huntington (West Virginia) District.[2] Defendant Flowers supervises and manages all Corps decisions and actions, including evaluation of § 404 permit decisions. (Compl.¶ 4.) The Court intended to enjoin these three, the "Corps Defendants," who are properly before the Court, from issuing § 404 permits from their ordinary place of business, the Huntington District.[3] The May 8 injunction does not have nationwide scope. However, because ninety-seven percent (97%) of stream length affected by valley fills in the nation, approximately 85 miles in the year 2000, was permitted by these Defendants in the Huntington District, the injunction necessarily will have substantial national impact. *See Kentuckians,* 204 F.Supp.2d at 929.

### B. Application to Activities Other Than Coal Mining

■ Movants next ask whether the injunction applies to activities other than coal mining or surface coal mining.[4] Ex-

---

2. Because Corps' districts are based on the watersheds of major rivers, the district comprises roughly half the state of Ohio, more than half of West Virginia, portions of eastern Kentucky, western Virginia and a relatively small area in North Carolina. *See Kentuckians for the Commonwealth, Inc. v. Rivenburgh,* 204 F.R.D. 301, 305 (S.D.W.Va.2001).

3. Movants assert the injunction should not apply in West Virginia because of the "investment backed expectations of operators in West Virginia made in part in reliance upon this Court's approved settlement agreement in

*Bragg* regarding § 404 permitting." (Intervenor–Defs.' Mem. in Reply to Pl.'s Opp'n at 16.) The *Bragg* settlement is discussed extensively, *infra* at III.A.5. Based on that discussion, the Court concludes there is no reason to except West Virginia from the injunction's reach.

4. Intervenor–Defendants also ask whether the injunction applies to § 404 permitting for 1) refuse impoundments, 2) fills from standard contour/strip surface mines, or 3) all fills related to mine sites with AOC waivers. Such specific applications of § 404 are appropriate-

amination of the CWA demonstrates Congress did not intend § 404 as an alternative permitting program for waste or pollutant disposal, with the single exception of disposal of dredged spoil. *See Kentuckians*, 204 F.Supp.2d at 934. While mountaintop removal overburden disposal in valley fills apparently constitutes the strongest example, it may not be the only case where § 404 permits are issued solely for waste disposal without a primary constructive purpose for the fill. The Corps Defendants are enjoined from issuing "§ 404 permits that have no primary purpose or use but the disposal of waste." *Id.* 204 F.Supp.2d at 946. By the plain terms of the order, permits for all activities fitting this description are enjoined.

### C. Dredged Spoil Disposal

■ As discussed at length in the May 8 Opinion, dredging of navigable waters and disposal of the resultant spoil was the crucial concern of Congress when it chose to maintain the Corps' dredge and fill permit program. *See Kentuckians*, 204 F.Supp.2d at 933–34. Nothing in the Court's findings, conclusions, or injunction is intended to alter or interfere with dredging and dredged spoil disposal under § 404.

### D. Rulemaking

■ According to the United States, the injunction is overbroad because it may be

ly determined by the agencies, applying the CWA as interpreted by the Court. They require technical expertise to determine whether the particular application has a primary constructive purpose, as described in the statute, 33 U.S.C. § 1344(f)(2), and the Corps' and EPA's longstanding regulations. *See* 33 C.F.R. § 323.2(e)(2001)(Corps' definition of "fill material"); 33 C.F.R. § 323.2(f)(Corps' definition of "discharge of fill material"); 40

seen to call into question the Corps' and EPA's May 3, 2002 rulemaking regarding agency definitions of "fill material." The rule, it is claimed, "was not properly challenged in this case . . . and the Federal Defendants were never given notice that its validity would be considered by the Court." (U.S. Mot. for Stay at 15.)

The injunction makes no reference to the rulemaking and does not enjoin or curtail it. The Corps, however, was the party that raised the issue of the proposed rule's validity. Defendants are reminded of *their* argument for summary judgment that 1) permitting § 404 valley to dispose of waste was a longstanding Corps' practice and 2) if the regulations supporting that practice were unclear or questioned, the forthcoming rulemaking would ensure the practice was legal, and moot the issues of *Count* One. (*See, e.g.,* Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 4–7 (setting forth proposed rule to demonstrate Corps' authority to permit valley fills under § 404).)

The Government's argument required the Court to consider the proposed rule and the agencies' complete explanations for that definitional change, contained in both the proposed and final rulemaking. *See* 65 Fed.Reg. 21292 (April 20, 2002); 67 Fed.Reg. 31129 (May 9, 2002)(signed prepublication copy provided to the Court). These materials were referenced by the parties, provided to the Court, and thoroughly and carefully examined.

C.F.R. § 232.2 (EPA definition of "discharge of fill material").

As discussed above, however, nothing in the injunction is intended to distinguish among § 404 permits based on types of mining operations. Mountaintop removal overburden valley fill permits are specifically designated because they are the type of § 404 permits at issue in the case before the Court.

Based on its analysis of the CWA and the legislative and regulatory history of § 404, the Court found the agencies' proposed rule was contrary to the spirit and letter of the CWA, inconsistent with the statutory scheme, and therefore *ultra vires*. *See Kentuckians*, 204 F.Supp.2d at 945. For these reasons, the Court concluded the Government's argument failed because the proposed rule did not moot the issue of Corps' authority to permit waste fills under § 404.

### E. Permanent Injunction Standard

■ As an equitable remedy, injunctive relief should be awarded only where plaintiff has shown he does not have an adequate legal remedy. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). An adequate legal remedy means "a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as a remedy in equity by injunction." 11A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 2944, p. 86 (2d ed.1995) (citation omitted). While a threat of irreparable injury usually must be shown on an application for a temporary restraining order or a preliminary injunction, "irreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy." *Id.* at 94.

■ "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). An injunction "should be carefully addressed to the circumstances of the case." *Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379 (4th Cir.2001)(citing *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir.1993)("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.")).

■ APA § 706(2) requires a court "hold unlawful and set aside agency action ... found to be" "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C). As the Court previously discussed, in permitting fills solely for waste disposal over decades, the Corps ignored its own regulations, the statute, an inter-agency agreement, and related statutes. *See Kentuckians*, 204 F.Supp.2d at 942. When the longstanding practice was challenged, the agencies undertook to change the rule so streams could be filled as immense waste dumps if the disposal had the "effect" of filling the waters of the United States. *See id.* 204 F.Supp.2d at 944–45. Having determined such waste disposal fills were contrary to and not authorized by the CWA, the Court was required to halt the practice. Where regulators were pushing ahead rapidly to change the rules, without regard for the purposes, policy, history, or language of Act itself, a declaratory judgment appeared as insubstantial as a headwater stream on a surface mine site. Simply put, an injunction is necessary to halt the illegal practice.

While the Court did not rely on irreparable harm explicitly, irreparable environmental damage provides further support for a permanent injunction. The streams buried under valley fills are destroyed. Free flowing streams are difficult to reconstruct. (Ex. 52 ¶ VI, Pl.'s Opp'n to U.S. Mot. for Stay, Aff. of J. Bruce Wallace, Ph.D.) Headwater streams provide numerous ecological functions, including the habi-

tat for a considerable portion of the unique aquatic diversity of the Appalachians. Headwater streams also provide nutrient retention, organic matter storage, processing, and transport to downstream areas. (*Id.* ¶ I.) Water quality below valley fills is seriously impaired. (*Id.* ¶¶ IV, XIII.) Stream loss contributes to loss of forested lands, which then diminishes downstream transport of organic matter, which provides important nutrients. This is just a partial account of the ecologic and environmental losses. Because, as Dr. Wallace notes, no biotic inventory has been made, "we don't know what is being lost." (*Id.* Concl. at 9.) With the exception of a single study on benthic macroinvertebrates, (Ex. CC, Mem. in Reply by Int.-Defs.), these expert findings and conclusions are undisputed and uncontroverted. They also accord with common sense.

 As the Supreme Court explained: Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

### F. Clarified Injunction

Accordingly, the Court maintains the permanent injunction as clarified:

The Corps Defendants are ENJOINED from issuing any further § 404 permits **within the Huntington District** that have no primary purpose or use but the disposal of waste, **except dredged spoil disposal.** In particular, issuance of

mountaintop removal overburden valley fill permits solely for waste disposal under § 404 is ENJOINED.

## III. STAY PENDING APPEAL

 The standard for granting a stay pending appeal is a fourfold equitable rule initially adopted in this circuit[5] in *Airport Comm. of Forsyth Co., N.C. v. CAB,* 296 F.2d 95, 96 (4th Cir.1961):

1) Has the petitioner made a strong showing that it is likely to prevail upon the merits of its appeal?

2) Has the petitioner shown that without such relief it will be irreparably injured?

3) Would the issuance of a stay substantially harm other parties interested in the proceedings?

4) Where lies the public interest?

*Id.; see also Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189, 193 (4th Cir. 1977); *accord, First–Citizens Bank & Trust Co. v. Camp,* 432 F.2d 481, 483 (4th Cir.1970); *see also Long v. Robinson,* 432 F.2d 977, 979 (4th Cir.1970). The four factors are "essentially independent" and each question must be answered. *Blackwelder,* 550 F.2d at 196. The stay standard is stricter than that applied to a request for interlocutory relief. *Id.* at 194 (citing *Long, supra,* 432 F.2d at 979 ("Judge Winter explained in *Long* that the petitioner's burden in seeking injunctive relief is substantially greater on appeal.")). A " 'strong showing ... must be made to justify reversal of the District Court's discretionary action[.]' " *Id.* (quoting *Railway Express Agency, Inc. v.*

---

**5.** The rule was first developed in *Virginia Petroleum Jobbers Ass'n v. Federal Power* *Comm'n,* 259 F.2d 921 (D.C.Cir.1958).

*United States*, 82 S.Ct. 466, 7 L.Ed.2d 432 (1962)(Harlan, J.)).

### A. Will Movants Prevail on the Merits?

Movants argue they will prevail on appeal because 1) the Court determined an issue not properly before it, and 2) prevented them from briefing *Chevron* deference to the agencies' interpretation of the definition of "fill material." Movants also contend 3) the Court's decision is extreme, unreasonable and irrational. They further claim 4) the decision is inconsistent with SMCRA, 5) the Settlement Agreement approved by the Court in *Bragg v. Robertson*, 54 F.Supp.2d 653 (S.D.W.Va.), precludes relitigation of the § 404 issues, and 6) § 10 of the Rivers and Harbors Act allows the Corp to permit waste disposal. The Court considers these issues *seriatim.*

### 1. The *Count* One Issue

▆▆▆ The Corps first argues it must prevail on the merits because the Court determined an issue not properly before it: "The narrow issue Plaintiff raised in its Complaint and that the parties presented for review in their cross-motions for summary judgment on Count 1 was whether the Corps can regulate valley fills associated with a single surface coal mine in Martin County, Kentucky under its implementing regulations that define the term "fill material." " (United States Mot. for Stay Pending Appeal, Mem. in Supp. ("U.S. Mem. for Stay") at 7.) [6]

*Count* One complained that by issuing § 404 permits to dispose of mining spoil, the Corps Defendants

*violated* the *Corps' regulations* and *section 404 of the Clean Water Act, 33*

*U.S.C. § 1344,* and have acted in a manner that is arbitrary, capricious, an abuse of discretion, and *otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706(2).*

(Compl. ¶ 60 (emphasis added).) APA § 706(2) provides pertinently:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> . . .
>>
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]

5 U.S.C. § 706(2).

The Court therefore attempted to determine whether these permits issued for disposal of mining waste violate the Corps' regulations, CWA § 404 and the APA. The issues squarely presented by *Count* One clearly were not limited to Corps' authority under its regulations, nor to the Beech Fork Processing, Inc. coal mine in Martin County, Kentucky. Beech Fork is simply an instance of the Corps' practice assailed by Plaintiff.

### 2. *Chevron* Deference

▆▆▆ The Corps Defendants also complain they were prevented from brief-

---

6. The named Defendants are all Corps officers. All motions and briefs on Defendants' behalf were presented, as here, as those of "the United States." Accordingly, the Court

identifies these arguments interchangeably as those of the Corps, the United States, or the Government.

ing *Chevron* deference to the agencies' interpretation of the term "fill material." *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where statutory meaning is not clear or the statute is silent on the precise issue before the reviewing court, *Chevron* requires deference to an agency's interpretation of the statute if that interpretation is reasonable or permissible. *Id.* at 843, 104 S.Ct. 2778.

The Government did brief this issue extensively, although it chose to present the question in terms of agencies' interpretation of their own regulations. (*See e.g.* Mem. in Supp. of United States Cross–Mot. for Summ. J. at 4–9) (section entitled "The Agencies' Longstanding Interpretation of Their Own Regulations, *which is Consistent with Congress' Express Intent in the CWA*, is Entitled to Deference" (emphasis added)). The parties, of course, were free to limit or expand their briefing within the range of relevancy as they deemed efficacious.

■ Movants also contend that because the CWA does not define the term "fill material," the statute is ambiguous and, under *Chevron*, the Court must defer to the agencies' reasonable construction. (*See, e.g.*, U.S. Reply Br. at 9, n. 7; Mem. of Law in Supp. of Int.-Defs.' Mot. to Stay at 10–11.) While the specific term "fill material" is not defined by statute, the CWA is not silent about the types of fills requiring § 404 permits. *See Kentuckians*, 204 F.Supp.2d at 937; 33 U.S.C. § 1344(f)(2)(fills "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject" require permits). Thus § 404 is neither silent nor ambiguous on the issue of § 404 fills and their purposes. A definition of "fill material" that ignores this portion of the statute, especially when the statutory language is fully consonant with other crucial considerations in the statute's purpose and its legislative history, is manifestly unreasonable.

■ If it were argued that, despite the clear language of § 1344(f)(2), the statute remains ambiguous with regard to "fill material," however, the Court's examination of the legislative and regulatory history, interagency agreements, and related statutes demonstrates any interpretation of § 404 fill material that ignores and deliberately eliminates the primary purpose test for fill authorization is contrary to the purpose, principles, and policy of the CWA. *See Kentuckians*, 204 F.Supp.2d at 944–45. Such an agency interpretation is not permissible.

### 3. The Court's Decision is not Extreme, Unreasonable or Irrational

■ The United States next argues the Court's decision is an extreme and unreasonable result, which "perpetuates a subjective and artificial primary purpose test for determining applicability of CWA § 404." (U.S. Mem. for Stay at 8.) A subjective test is one "based on an individual's perceptions, feelings, or intentions, as opposed to externally verifiable phenomena." *Black's Law Dict.* (7th ed.1999). However, a permit applicant's intent to fill waters for a primary constructive purpose such as road building as opposed to waste disposal need not be divined through mind-reading, nor is the relevant evidence limited to the applicant's own statements thereon. Parties building roads, for example, file maps and plans, obtain permits, undertake engineering studies, and acquire land.

For another example, when a surface mine operator intends a postmining land use providing a waiver of approximate original contour requirements, it must

"present *specific plans* ... and *appropriate assurances* that such use will be -

(i) compatible with adjacent land uses;

(ii) obtainable according to data regarding expected need and market;

(iii) assured of investment in necessary public facilities;

(iv) supported by commitments from public agencies where appropriate;

(v) practicable with respect to private financial capability for completion of the proposed use;

(vi) planned pursuant to a schedule attached to the reclamation plan ...; and

(vii) designed by a registered engineer[.]"

30 U.S.C. § 1265(c)(3)(B)(emphasis added). As the statute shows, numerous objective indicia may support a claim of constructive primary purpose. Appropriate agency responsibility would include developing criteria supporting such purpose evaluations.

The primary purpose test is also neither "artificial" as the Government contends, (U.S. Mem. for Stay at 8), nor "unreasonable" and " 'plainly at variance with the policy of the legislation as a whole.' " (*Id.* at 9 (quoting *United States v. Am. Trucking Ass'ns, Inc.,* 310 U.S. 534, 543; 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)).) In fact, the statute itself explicitly requires § 404 permits for fills in the navigable waters of the United States "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject[.]" 33 U.S.C. § 1344(f)(2).

Most importantly, the goal and objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* at § 1251(a). It would be unreasonable and in stark variance with CWA policy to allow the nation's waters to be filled and destroyed solely to dispose of waste.

Contrary to the Government's argument, it is also not unreasonable or irrational to allow identical materials, such as rock and dirt, to be placed in waterways for one (constructive) purpose, but not another (waste disposal). As Plaintiff notes, site-development fills are often necessary to support socially beneficial and water-dependent development. Roads, malls, post-mining land use development, and numerous other *uses* may require fills. In the environmental/social tradeoff, some diminution or loss of the nation's waters is accepted in exchange for socially beneficial development. But if streams or rivers are filled for no purpose but waste disposal, the waste dumper destroys environmental values without supplying the social benefit in return.

As discussed at length in the May 8 Opinion, in SMCRA Congress made explicit this economic/environmental balance and social compact for surface coal mining. *See Kentuckians,* 204 F.Supp.2d at 941–42.

**4. May 8 Decision is Consistent with SMCRA**

Movants propose SMCRA "clearly envisions the placement of excess spoil fills in streams." (U.S. Mem. for Stay at 9–10.) In support of this proposition they note "excess spoil" is referred to four times in § 1265 of the statute and point particularly to § 1265(b)(22)(D), which requires surface mine operators to:

(22) place all excess spoil material resulting from coal surface mining and reclamation activities in such a manner that -

. . .

(D) the disposal area does not contain springs, natural water courses or wet weather seeps unless lateral drains are constructed from the wet areas to the

main underdrains in such a manner that filtration of the water into the spoil pile will be prevented[.]

30 U.S.C. § 1265(b)(22)(D). While a careful reading of this subsection reveals a prohibition of spoil placement in ephemeral streams,[7] i.e. "water *courses* " or other potentially wet places, such as "springs" or "wet weather seeps," it also aids precise comprehension to place this subsection in its SMCRA context.

SMCRA § 1265 provides the environmental protection performance standards for surface mining of coal. General performance standards require "as a minimum" restoring the land so it can support its prior uses, so long as that does not "pose any actual or probable threat of water diminution or pollution[.]" *Id.* at § 1265(b)(2). The operator must also restore the land affected to its approximate original contour ("AOC"), *id.* at § 1265(b)(3), unless an "industrial, commercial, agricultural, residential or public facility (including recreational facilities) use is proposed." *Id.* at 1265(c). Where there is spoil in excess of that needed to restore AOC ("excess spoil"), it must be "shaped and graded in such a way as to prevent ... water pollution." *Id.* at § 1265(b)(3). Operators must "refrain from the construction of roads or other access ways up a stream bed or drainage channel or in such proximity to such channel so as to seriously alter the normal flow of water." *Id.* at § 1265(b)(18).

Within this water-protective context, subsection (b)(22) governs excess spoil placement, that is, again, only spoil not needed to restore AOC. Excess spoil must be placed within the mine permit area so it is *stable,* with drainage and diversion ditches *to prevent* spoil *erosion and movement.* *Id.* at § 1265(b)(22)(A),(B),(C). "If placed on a slope, the spoil is placed upon the most moderate slope upon which ... it could be placed." *Id.* at (E). It shall be placed, "where possible, upon, or above, a natural terrace, bench, or berm, if such placement *provides* additional *stability* and *prevents mass movement.*" *Id.* If the toe of the spoil rests on a downslope, a rock toe buttress "of sufficient size *to prevent mass movement,*" must be constructed. *Id.* at (F). The final configuration must be "compatible with the natural drainage pattern", *id.* at (G), and its design approved by a qualified registered engineer. *Id.* at (H). It is clear that Congress's concern, addressed in § 1265(b)(22), is that excess spoil placement be stable and immovable.

Within this context, subsection (b)(22)(D) is easily understood:

(D) the disposal area does not contain springs, natural water courses or wet weather seeps unless lateral drains are constructed from the wet areas to the main underdrains in such a manner that filtration of the water into the spoil pile will be prevented[.]

30 U.S.C. § 1265(b)(22)(D). Where water may find its way under the excess spoil site, either because there is a wet weather seep, a spring, or a natural water course, i.e., a bed or channel where water could and would run, lateral drains must carry any water to underdrains so no water may filter into the pile, making it unstable and subject to movement. It is a far stretch, and not reasonable in the statutory context, to maintain this buried sub-sub-subsection of SMCRA shows Congress intended excess spoil to be dumped and disposed of in waters of the United States so long,

7. Ephemeral streams flow "only in direct response to precipitation in the immediate watershed or in response to the melting of a cover of snow and ice, and [have] a channel bottom that is always above the local water table." 30 C.F.R. § 701.5; *see also Bragg,* 72 F.Supp.2d at 653, n. 20.

apparently, as the streams filled are drained away from the spoil piles.

The contextual analysis of subsection (b)(22)(D) is supported by the legislative history cited by Movants, which is simply the House Report subsection on mountaintop mining. (U.S. Mem. for Stay at 9 (citing H.R.Rep. No. 95–218, at 101 (1977))(1977 U.S.C.C.A.N. 634–35).)

> Mountaintop mining also produces a massive amount of spoil to be handled and *stabilized* in a very difficult environment of steep slopes and high rainfall. Some approaches have been developed which keep virtually all of the spoil on the mountaintop.... Retention of spoil on the mountaintop bench has advantages over placement of such spoil in valleys and hollows. However, such placement off the mountaintop does offer the possibility of improved land uses through the creation of significantly expanded areas of flat land.... Surplus spoil disposal areas must be carefully engineered to avoid *instability*, drainage control problems, *and erosion*.... [T]he ultimate *stability* of spoil disposal technologies being used. in the valleys and hollows of several Appalachian States are unknown. Given the size and complexity of the engineering involved for the disposal areas, specific standards such as the following should be considered. [Standards very similar to those in subsection (b)(22) follow.]

The analysis of this section of SMCRA is also consistent with and supported by the Court's previous extensive analysis of SMCRA's provisions for disposing of excess spoil in ephemeral, but not intermittent or perennial streams. *See Bragg v. Robertson*, 72 F.Supp.2d. 642 (S.D.W.Va. 1999), *affirmed in part, vacated in part on other grounds*, 248 F.3d 275 (4th Cir.2001).

For these reasons, the Court FINDS and CONCLUDES that § 1265(b)(22)(D) does not contemplate the placement of excess spoil fills in perennial or intermittent streams, that is, in waters of the United States. SMCRA subsection 1265(b)(22)(D) is fully consistent with the May 8 Opinion and its rationale.

### 5. The *Bragg* Settlement Agreement has no Preclusive Effect

▮ Movants argue they will prevail on the merits on appeal because the issue in *Count* One was previously litigated and decided in *Bragg v. Robertson*, 54 F.Supp.2d 653 (S.D.W.Va.1999)(accepting and approving Settlement Agreement). The Settlement Agreement was concluded between the *Bragg* plaintiffs (none of whom are plaintiffs here) and the *Bragg* defendant Corps officers who hold the same positions as the Corps Defendants currently before the Court.[8] On Movants' account, the Court's approval of the *Bragg* Settlement Agreement decided the issue whether the Corps can regulate the discharge of mine spoil or overburden into

---

8. The Settlement Agreement generally provided that EPA, the Corps, the Office of Surface Mining ("OSM"), U.S. Fish and Wildlife Service ("FWS"), and the West Virginia Department of Environmental Protection ("WVDEP") would prepare an Environmental Impact Statement ("EIS"). The EIS goal was to help the agencies:

> minimize, to the maximum extent practicable, the adverse environmental effects to waters of the United States and to fish and wildlife resources affected by mountaintop

mining operations, and to environmental resources that could be affected by the size and location of excess spoil disposal sites in valley fill.

[S/A] ¶ 7. Additionally, before the EIS was completed, applications for mountaintop mining operations in West Virginia proposing to discharge overburden in waters of the United States draining a watershed of 250 acres or more would require an *individual*, rather than a general, § 404 permit. *Id.* ¶ 11 (emphasis added).

valley fills under § 404. Movants particularly rely on the Court's statement that the Agreement "is fair, adequate, reasonable, and faithful to the environmental statutes under which the litigation was brought." *Bragg,* 54 F.Supp.2d at 670. The United States acknowledges this ostensible "holding" on the Corps' § 404 authority may be only "implicit," (U.S. Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 17), but nonetheless contends collateral estoppel applies to bar any relitigation.

A settlement agreement is essentially a contract between the parties. 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4443, pp. 255–56 (2d ed.2002). "To support preclusion at all, there must be a judgment in some form" beyond the parties' contract or agreement. *Id.* With regard to court review,

> [i]f there is a judgment in some form, *the central characteristic of a consent judgment is that the court has not actually resolved the substance of the issues presented.* To be sure, in various circumstances judicial approval of a consent judgment may require careful scrutiny of its fairness in light of the probable outcome on the merits.... However close the examination may be, the fact remains that it does not involve contest or decision on the merits. *Any findings made as part of the approval process go to the reasonableness of the settlement, not the merits of the dispute.* The judgment results not from adjudication but from a basically contractual agreement of the parties.

*Id.* (emphasis added).

■ The Supreme Court recently reviewed these principles. *See Arizona v. California,* 530 U.S. 392, 414–15, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000). The Court explained,

> It is the general rule that issue preclusion attaches only "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this section [describing issue preclusion's domain] does not apply with respect to any issue in a subsequent action."

*Id.* (quoting Restatement (Second) of Judgments § 27, p. 250 & cmt. e, at 257 (1982)). "The way in which a consent judgment or consent decree resolves, between the parties, a dispute over a legal issue is not a ruling *on the merits* of the legal issue that either (1) becomes precedent applicable to any other proceedings under the law of *stare decisis* or (2) applies to others under the law of claim preclusion or issue preclusion." *Langton v. Hogan,* 71 F.3d 930, 935 (1st Cir.1995).

These principles set forth with clarity that the Court's evaluation of the *Bragg* parties' Settlement Agreement as "fair, adequate, reasonable and faithful to the environmental statutes," did not constitute or create any ruling on those statutes, their meaning or their authority. Specifically, the undersigned judge, in *Bragg,* did not determine the legal issue whether the Corps' application of § 404 of the CWA, which the *Bragg* parties agreed the Corps would continue to employ, was consonant with the CWA under the APA. Because those claims were disposed of in a court-approved settlement, they were not litigated or decided on the merits and therefore, *Bragg* provides no basis for *collateral estoppel,* that is, issue preclusion.

■ Because settlement agreements are basically contractual, the parties may agree to preclusion and such "preclusive effects should be measured by the

intent of the parties." 18A *Federal Practice and Procedure* § 4443 at 262. The Settlement. Agreement contains two such provisos. The *Bragg* plaintiffs reserved the right to challenge under the APA "any future Corps' CWA section 404 authorization for any valley fill in waters of the United States that may be authorized by the Corps" after the settlement. [S/A] ¶ 16. The *Bragg* plaintiffs further agreed not to challenge Corps' § 404 authority to permit mining spoil disposal "based on the argument that such spoil is not fill material pursuant to 33 C.F.R. § 323.2(e) [the Corps' definition of 'fill material']." *Id.* The *Bragg* plaintiffs' contractual agreements, however, do not implicate or bind Plaintiff in this action, who was no party to that agreement. Even assuming otherwise, only *arguendo,* the reserved right to challenge the Corps' § 404 authority under the APA is the *Count* One issue submitted for summary judgment consideration.

▮▮▮▮ Movants also rely on the *Bragg* parties' agreement voluntarily to dismiss their claims against the Corps with prejudice and the *Bragg* court's explanation that a dismissal with prejudice " 'acts as an adjudication on the merits with full preclusive effect.' " *Bragg,* 54 F.Supp.2d at 661 (quoting *Bioxy, Inc. v. Birko Corp.,* 935 F.Supp. 737, 740 (E.D.N.C.1996)). Such "full preclusion" applies only to claims, not to issues, however. A stipulation of dismissal with prejudice constitutes a "final judgment on the merits for the purpose of *res judicata* (claim preclusion) though not for the purpose of collateral estoppel (issue preclusion)." *Sullivan v.*

*Easco Corp.,* 662 F.Supp. 1396, 1408 (D.Md.1987)(citing *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 327, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)).

▮▮▮▮ The Government next argues the *Bragg* plaintiffs made essentially the same claim regarding the Corps as Kentuckians do. "Two causes of action are deemed the same for the purposes of *res judicata* only if the same evidentiary facts would support both actions." *Sullivan,* 662 F.Supp. at 1408 (citing 18C C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4407). The issues before the Court, however, were not submitted on matters of fact, but agreed by all parties to be entirely questions of law, making claim identity and preclusion inapplicable. Additionally, but crucially, identity of the parties in the first and second action, which is required if *res judicata* is to be applied, *id.* § 4448, is entirely absent.[9]

For these reasons, the Court FINDS and CONCLUDES that neither the *Bragg* Settlement Agreement nor the Court's acceptance and approval thereof bars litigation of the legal issues raised by *Count* One in this action filed by Plaintiff, not a party to the *Bragg* agreement nor in privity with the *Bragg* plaintiffs, under the doctrines of *res judicata, collateral estoppel* or contractual agreement.

### 6. Corps May Not Permit Waste Disposal Under § 10 of the Rivers and Harbors Act

▮▮▮ The United States notes "there are numerous other arguments" that the

---

**9.** The Government notes that preclusion doctrines apply not only to the same parties, but also to those in privity with a party to an earlier litigation. Further, "federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." (Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 18) (quoting *Braxton v. Matthews,* 883 F.Supp. 1068, 1070 (S.D.W.Va.1995)).

This exception applies only "in certain limited circumstances." *Martin v. Wilks,* 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)(giving examples of *Rule* 23 class action or representative suits or where litigation was controlled "on behalf of one of the parties"). Neither limited circumstance applies here.

Government may raise on the merits; however, it provides only one. According to the Government, Section 10 of the Rivers and Harbors Act ("RHA") does not only regulate activities with a useful purpose, but covers any activity that creates an "obstruction," including waste disposal. (U.S. Mem. for Stay at 7, n. 5 (citing *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960)(Douglas, J.); *United States v. Joseph G. Moretti, Inc.*, 478 F.2d 418 (5th Cir.1973)).) On this basis, it is claimed, "the Court's narrow interpretation of section 10, and thereby section 404, is plainly inconsistent with the language of section 10, which regulates fills that would 'in any manner' 'alter' or 'modify' a navigable water.'" *Id.*

RHA § 10 contains the precursor authority to the § 404 dredge and fill permit program, as discussed in the May 8 Opinion. *See Kentuckians*, 204 F.Supp.2d at 934–35. Section 10 provides in full:

> *That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited;* and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwa-

ter, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403 (emphasis added).

The Court cannot improve on the explanation of the structure of this statute and the relation between "obstruction" in the initial clause and the Secretary of the Army's (i.e. Corps') permit program described in the remainder, given by Justice Douglas:

> [T]he ban of "any obstruction," unless approved by Congress, appears in the first part of § 10, followed by a semicolon and another provision which bans various kinds of structures unless authorized by the Secretary of the Army.
>
> The reach of § 10 seems plain. Certain types of structures, enumerated in the second clause, may not be erected "in" any navigable river without approval by the Secretary of the Army. Nor may excavations or fills, described in the third clause, that alter or modify "the course, location, condition, or capacity of" a navigable river be made unless "the work" has been approved by the Secretary of the Army. *There is, apart from these particularized invasions of navigable rivers, which the Secretary of the Army may approve, the generalized first clause which prohibits "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity" of such rivers. We can only conclude that Congress planned to ban any type of "obstruction," not merely those specifically made subject to approval by the Secretary of the Army. It seems, moreover, that the first clause being specifically aimed at "navigable capacity" serves an*

*end that may at times be broader than those served by the other clauses.*

*Republic Steel,* 362 U.S. at 486–87, 80 S.Ct. 884 (emphasis added).

Having deconstructed the statutory grammar, Justice Douglas then found that the term "obstruction" in § 10 is "broad enough" to include diminution of the navigable capacity of a waterway by waste disposal. *Id.* at 489, 80 S.Ct. 884. However, as his explanation makes clear, the broad prohibition of clause one "obstructions," which *Republic Steel* extends to those caused by industrial waste disposal, is separate and distinct from the Corps permit program provided in the second and third clauses. *Republic Steel* says waste may create obstructions, but it does not say that the Corps may permit them.

*Moretti* did not involve waste disposal, but rather a dredge and fill operation undertaken to create land fingers and channels for a mobile home park, i.e., a constructive purpose. *Moretti,* 478 F.2d at 421–22. As the Court has noted repeatedly, Congress explicitly enacted § 404 to allow dredge and fill permitting to continue under the Corps permit program originally enacted under RHA § 10. The *Moretti* court properly concluded a Corps permit was required, although the regulation allowed it to be obtained after the fact. *Id.* at 431.

The Court concludes its analysis of the Corps' dredge and fill permit program, precursor to § 404, is not unduly narrow. *See also Kentuckians,* 204 F.Supp.2d at 934–35 (analyzing the earlier regulatory regime). Rather, the Government is attempting to attach a purpose to that program in a manner explicitly disallowed by Justice Douglas's analysis in *Republic Steel.*

**7. Conclusion: Appeal on the Merits**

The May 8 Opinion is not extreme, unreasonable, or irrational. Its analysis of the CWA and § 404 are consistent with SMCRA. The *Bragg* Settlement Agreement does not preclude litigation of the issues presented to the Court for summary judgment on *Count* One. Section 10 of the RHA does not authorize the Corps to permit waste disposal. Having considered all these arguments, the Court FINDS and CONCLUDES Movants have failed to make a strong showing they are likely to prevail upon the merits on appeal.

**B. Have Movants Shown that Without a Stay They Will Suffer Irreparable Injury?**

█ Movants contend that without a stay citizens of Appalachia will suffer irreparable economic harm. Coal mines will close and new mines will not be approved, according to Movants, because most surface and underground mining operations are "dependent on" waste fills that cannot be permitted under the injunction. (U.S. Mot. for Stay at 3.) They state that all steep-slope mining operations "require the disposal of excess spoil into waters of the United States[.]", (*id.* at 4), and that generally "most coal mining operations are dependent on fills". *Id.* at 5. Movants' claims of the absolute necessity to Appalachian coal mining of waste disposal fills in waters of the United States are supported by affidavits making similar avowals. For example, William J. Grable, Executive Director of the Kentucky Coal Council, avers, "[V]irtually every mining operation in eastern Kentucky, whether it is surface or underground, requires the use of a fill to dispose of excess rock generated during the mining process. If fills are banned, mining in eastern Kentucky simply cannot exist." [10] (U.S. Mot. for Stay, Ex. C ¶ 6.)

From this premise, Movants derive economic predictions. "Some Kentucky operations are facing *imminent catastrophe* if they are unable to obtain § 404 permitting *within one to two months.*" (Mem. of Law in Supp. of Int.-Defs.' Mot. to Stay at 5 (emphasis in original).) Lost mining jobs will have a ripple effect within local economies and states will lose tax revenues. *See id.* at 8.

Obviously, these predicted scenarios are not social scientific studies. The largest and most complete studies to date of possible economic outcomes, considering various limitations on valley fill size, were performed in conjunction with the EIS, promised by the Federal Defendants in the *Bragg* Settlement Agreement. (*See supra,* n. 8.) That study was to have been completed within two years, i.e., by 2000. Two years beyond that deadline it is not yet completed, but remains in preliminary draft form, although all parties and the Court have examined it in its draft form through materials provided to Plaintiff under FOIA[11] requests. (*See* Ex. 41, Pl.'s Mem. in Resp. to U.S. Mot. for Stay.)

■ The Government moved to exclude the Preliminary Draft EIS ("PDEIS") as hearsay. The draft documents are clearly labeled as preliminary, not the final positions of the agencies involved, and as incomplete because they have not undergone interagency review. (*See e.g.* Pl.'s Mem. in Opp'n to U.S. Mot. for Stay, Ex. 36). Interestingly, the economic studies at issue provide evidentiary ammunition for both sides' view of potential economic outcomes, so that Interve-

nor–Defendants also advance material from the PDEIS in support of a stay.

The Court agrees, however, that the PDEIS is not admissible, *in toto.* When finalized, the EIS will be a statement of EPA, the Corps, OSM, FWS and the WVDEP. These agencies, however, have not adopted the statement as final, complete, or evidencing their conclusions, but rather disavow any such purported use. Presumably, the PDEIS would be offered under hearsay exception 803(8)(C), public records and reports, providing for admission in civil cases of "factual findings resulting from an investigation made pursuant to authority granted by law, *unless the sources of information or other circumstances indicate lack of trustworthiness.*" Fed. R. Evd. 803(8)(C) (emphasis added). The PDEIS, as a preliminary draft, disavowed by the authoring agencies as to reliability or conclusivity, and, particularly with regard to economic predictions, coming to disparate, if not directly opposed conclusions, lacks trustworthiness necessary for admission.

■ Contained within the PDEIS, however, are documents, complete in themselves and comprising data, which do not represent either unvouched-for studies or agency conclusions or positions, for example, the inventory of valley fills in Kentucky, West Virginia, Virginia and Tennessee. (Pl.'s Mem. in Resp. to U.S. Mot. for Stay, Ex. 40, ("PDEIS"), p. III K–21,) These are public documents gathering and reporting data, which have no indicia of untrustworthiness. Accordingly, the Court may rely on some documents presented within the PDEIS.

---

10. A potential circularity must be acknowledged. So long as the Corps permits valley fills, engineers plan to use them and operators rely on them, valley fills will appear indispensable.

11. Freedom of Information Act, 5 U.S.C. § 552.

Attached to their reply memorandum, Intervenor–Defendants provided a study by the Center for Business and Economic Research at Marshall University entitled "The Fiscal Implications of Judicially Imposed Surface Mining Restrictions in West Virginia." (Ex BB, Int.-Defs.' Mem. in Reply to Pl.'s Opp'n.) Because the study was provided with the reply, no other party has had an opportunity to respond to it; in effect, it has not been cross-examined and its trustworthiness is thus indeterminate. While the study provides extensive forecasts of economic data, such as projected employment, state tax revenues, personal income, and property evaluations, the mining projections are based on a simple scenario under which it is assumed permitted mines continue to operate, however, *"no further permitting of surface operations involving fills is allowed."* (*Id.* at ii (emphasis added).) This is the single reference in this study to this crucial presumption, which is not further discussed or supported.

As discussed above, all of Movants' predictions rely on the same premise: no coal mining can take place if § 404 fills are not allowed for waste disposal in waters of the United States.[12] Coal mines, they argue, are *dependent on* and *require* these fills. If coal mining waste cannot be disposed of in streams, they claim, the mines must close. The Court agrees, for the sake of argument, that if all or a majority of coal mines in the Corps' Huntington District closed, economic dislocation would be severe and as Movants reiterate, "real people would lose real jobs."

In response, Plaintiff maintains that many of the permits at issue may be reconfigured to avoid water placement of waste. SMCRA assumes, as previously discussed, that most spoil will be used to restore AOC. *See* 30 U.S.C. § 1265(b),(d). Excess spoil, according to Plaintiff's mining expert, John S.L. Morgan, may be placed on land, not in water, on previously mined areas not returned to AOC, previously disturbed areas such as old refuse impoundments, side hill fills, and more distant disposal locations.[13] (Pl.'s Mot. for Summ. J., Ex. 50 ¶ 17.) As the Court previously noted, operators believe valley fills are desirable because they provide the cheapest method of waste disposal, at least in terms of the industry's internal economics. *Kentuckians*, 204 F.Supp.2d at 945. Whether the fills are necessary and required for successful coal recovery remains a separate issue.

Movants oppose Plaintiff's claim that mine plans can be reconfigured for spoil disposal that does not fill streams. Taking the example of Beech Fork, Intervenor–Defendants argue:

Beech Fork Processing will cease operations within a matter of days. Beech Fork has placed fill in an inactive permit site pending a decision by the Corps for the continuation of an existing § 404 permit, one alternative touted by the Plaintiff. Ironically, Beech Fork's imminent cessation validates the Plaintiff's observation that "the actual effect of [no additional coal mining waste fill permits]

12. Contradictory to the above supposition, the PDEIS provides an extensive analysis of projected coal production based on limitations on valley fill size from 35– to 250–acre watersheds.

13. The Corps' own regulations incorporate this presumption: Where a proposed project "does not require access or proximity to or

siting within the special aquatic site in question to fulfill its basic purpose (i.e. is not 'water dependent'), *practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise."* 40 C.F.R. § 230.10(a)(3)(emphasis added).

can only be determined by a detailed analysis of each operating mine." It also refutes their conclusion that the Court's decision of May 8 will have a more than minimal effect [sic] on the industry and the region. Beech Fork will close and the jobs of more than 400 employees at the mine and affiliated operations will be lost by that decision. The irreparability of this harm is neither limited to Beech Fork nor to any other mine, the "detailed analysis" of which the Defendants to this action are not required to provide.

(Int.-Defs.' Mem. in Reply at 9 (citations omitted).)

Speaking for itself and its own interests, on June 3, 2002 Beech Fork provided a new Pre–Construction Notification ("PCN") to the Huntington District Corps. (Pl.'s Supp. Status Report, Ex. 59 at 1.) In the PCN, Beech Fork now "proposes not to place spoil in jurisdictional waters of the United States, with the exception of ponds." *Id.* Beech Fork's reworked proposal uses adjacent old mining areas to re-engineer its existing mine plan to comply with Court's May 8 Opinion. *Id.* "Beech Fork has confidence that it may be able to mine the entire reserve by placing fills with a constructive purpose in jurisdictional waters of the United States." *Id.* The company emphasizes the re-engineering and obtaining property for disposal have cost "substantial sums of money," and Beech Fork would "like to operate as originally authorized." *Id.* at 1–2. However,

the company concedes: if the law requires mining spoil not be disposed of in waters of the United States, Beech Fork can comply and still mine the entire reserve.

Beech Fork's post-injunction PCN is a powerful substantiation of Plaintiff's position and a clear recognition that waste disposal fills in national waters are not *necessary* to mine coal. Beech Fork, which originally proposed twenty-seven valley fills, filling six miles of Kentucky streams, (*see* Compl. ¶ 9), now acknowledges no waters need be filled except as justified by a constructive purpose. All parties agree that re-engineering and re-configuring to generate creative alternatives to valley fill waste disposal require a fill-by-fill and mine-by-mine analysis. Nonetheless, the premise of Movants' irreparable harm argument, that these fills are required and all mines are dependent on them, is demonstrably false.[14]

To stay the Court's injunction would be an invitation to coal operators like Beech Fork to save money by continuing their current waste disposal practices, filling miles of Appalachian streams in disregard of the statutory scheme.

The Court also has examined the effect of its prior ruling restricting the construction of valley fills in perennial and intermittent streams in West Virginia. *See Bragg,* 72 F.Supp.2d 642 (S.D.W.Va.1999). Although the Court stayed its order nine days after it issued, no permits authorizing valley fills were issued by the WVDEP in 1999. According to figures provided by

---

14. Further supporting this conclusion, WVDEP official Matt Crum stated only fifty-nine (59) of one hundred twenty-three (123) mining applications pending in West Virginia contemplate fills requiring a § 404 permit. (Pl.'s Mem. in Opp'n to Int. Defs.' Mot. to Stay, Ex. 58) (WVDEP May 17, 2002 press release).

Additionally, the PDEIS contains an inventory of valley fills in Kentucky, West Virginia, Tennessee, and Virginia, where surface coal mining is concentrated, ninety percent (90%) occurring in Kentucky and West Virginia. From 1985 to 1999 only 1,271 of 6,234 mining permits in Kentucky and 305 of 2,527 in West Virginia were issued with valley fills. (PDEIS at III K–22, 28.) Clearly *all* mining operations have not and do not *require* such permits.

Intervenor--Defendants, coal production in West Virginia in 1998 was 171,145,000 tons; in 1999 157,978,000 tons; in 2000 158,257,000 tons; and in 2001 preliminary figures report 160,377,000 tons. (Int.-Defs.' Reply at 10, n. 7.) Significantly, although *no* permits authorizing valley fills were issued in West Virginia (because of regulatory choice, not court action), 1999 coal production was reduced only 7.6%. Other factors, of course, could have played a part, but even assuming, *arguendo*, that the 7.6% reduction was due entirely to issuing no valley fill permits for waste disposal, West Virginia mines continued to produce substantial amounts of coal. Ninety-two point four percent (92.4%) of the previous year's coal production was achieved, even without re-engineering and reconfiguring permits to satisfy the CWA (as Beech Fork has done). Again, this belies Movants' argument that all coal mines *require* permits for waste disposal in streams and, without such permits, all mines will close, possibly within weeks.

Somewhat tautologically, irreparable harm is harm that cannot be repaired. 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civ.2d* § 2944, pp. 95–96 (1995). A possible potential diminution in annual coal production, some of which may be avoided by mine reconfiguration to avoid waste fills previously permitted under § 404, is not irreparable harm. What is not mined today may be mined tomorrow, unless it is determined it cannot be

mined under the CWA, in which case it should not be mined today or in the future. While mine re-engineering may entail costs to the coal operators, it may also encourage achievement of AOC, promote AOC waivers for socially beneficial projects, provide a use for previously unreclaimed mine lands (now a drain on state coffers and the Abandoned Mine Reclamation Fund), and require additional equipment operators and truckers for land-based waste disposal, all potential benefits to state residents and coal miners.

For these reasons, the Court **FINDS** and **CONCLUDES** Movants have failed to demonstrate irreparable harm absent a stay of the May 8 Injunction Order.

*C. Would the Issuance of a Stay Substantially Harm Other Interested Parties?* [15]

■■■ With the stay, the Corps will issue § 404 permits for more waste disposal valley fills, like those that have already destroyed hundreds of miles of streams directly and caused untold downstream consequences indirectly. The PDEIS shows [16] one percent of all streams in the study areas have been eliminated by valley fills (560 of 55,000 miles). Downstream stream segments are being impaired. Free-flowing streams once destroyed are not recreated. As the agencies acknowledge, "The direct and indirect aquatic impacts from MTM/VF [17] operations are ar-

---

**15.** The Court incorporates, without repeating, its earlier discussion of irreparable harm, *supra* at II.E.

**16.** The Court does not rely on the PDEIS economic predictions for reasons discussed above. With regard to environmental consequences, however, the Court notes the EIS promised in *Bragg* is now two years overdue. It was intended to be an *environmental* (not *economic*) impact study. While the economic conclusions reached are conflicting, and

based on challenged theories and presumptions, the environmental conclusions are internally consistent and consistent with admissible data provided by Plaintiff's stream-study expert. So, while the Court does not rely on the PDEIS, it does reference portions it believes to be trustworthy because multiply corroborated.

**17.** Mountaintop mining/valley fill.

guably more than minimal[.]" (Pl.'s Mem. in Resp. to U.S. Mot. for Stay, Ex. 45, p. 1.)

Intervenor–Defendants characterize Plaintiff's injuries as simply "aesthetic." Paragraphs 24, 27–29, and 37–38 of the Complaint belie this characterization; there Plaintiff complains of the environmental harms discussed above.

As quoted earlier, "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco,* 480 U.S. at 545, 107 S.Ct. 1396.

### D. Wherein Lies the Public Interest?

■ The public interest lies, first and foremost, in supporting the Clean Water Act. The purpose of the CWA—to restore and maintain the integrity of the Nation's waters—must be the Court's focus. *See Amoco,* 480 U.S. at 543, 107 S.Ct. 1396 ("The [appeals court] erroneously focused on the integrity of the *permit process* rather than the integrity of the Nation's water.").

Movants point to predicted economic harms to the region if surface coal mining overburden cannot be disposed of cheaply by filling streams. That choice, however, between cheap mining and destruction of the nation's waters has been made by Congress, both in the Clean Water Act and in SMCRA. The Court's duty is to apply the laws Congress enacted. Under § 404 of the CWA, the Corps may not permit filling waters of the nation solely for waste disposal.

Having considered the factors going to a stay pending appeal, the Court **FINDS** and **CONCLUDES** Movants have not made a substantial showing they will prevail on the merits of their appeal nor that, without a stay, they will be irreparably harmed. On the other hand, issuance of a stay would allow additional environmental damage, which is extensive and irreversible, to continue unabated. The purpose of the Clean Water Act is to protect and improve the Nation's waters. Upholding that purpose is of the highest public interest. Accordingly, Movant's motion for a stay pending appeal is **DENIED**.

### IV. MOTION TO JOIN BEECH FORK AS A NECESSARY PARTY

■ Kentucky Coal Association ("KCA") moved to dismiss for failure to join Beech Fork as a necessary party or, alternatively, to transfer venue. Martin County Coal Company (MCCC) initially obtained the § 404 permit for the mine near Inez, Kentucky, which is a subject of this action. MCCC leased the coal rights for the mine from the owner Pocahontas Development Corporation, an Intervenor–Defendant. After the action commenced, MCCC sold its lease rights to Beech Fork Processing, Inc. ("Beech Fork"), which is mining coal there. Currently, Beech Fork has § 404 permits for twenty-seven (27) valley fills, however, the company is not permitted to discharge fill under those permits until its mitigation plan is approved by the Corps. *See Kentuckians,* 204 F.Supp.2d at 933, n. 6. Additionally, Beech Fork has filed a revised PCN to continue mining without waste disposal valley fills in waters of the United States.

*Rule* 19(a) provides that an absent party is necessary if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or

impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. Fed.R.Civ.P. 19(a). If a party is necessary, the Court must determine whether it is also indispensable. Fed.R.Civ.P. 19(b). No one suggests Beech Fork's absence would preclude the Court from fashioning complete relief between Plaintiff and the Corps. Relying on subsection (2) of the rule, KCA argues Beech Fork is necessary because it holds the permit at issue and cannot defend its property interests in that permit if it is absent.

"The 'interest relating to the subject matter of the action,' that makes an absent person a party needed for just adjudication, must be a legally protected interest, and not merely a financial interest or interest of convenience." 3A James W. Moore et al., *Moore's Federal Practice* ¶¶ 19.07–1 [2.–0] at 19–99 (1993); *see also Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466, 468 (1986)(same); *Kenko Int'l, Inc. v. Asolo S.r.l.*, 838 F.Supp. 503 (D.C.Colo.1993)(same). While Beech Fork has both economic and convenience interests in its § 404 permit, it has not demonstrated a legally protected interest,[18] in particular, either the ownership or property interest that KCA claims for it.

A § 404 permit is issued by the Corps in conformance with the CWA, particularly 33 U.S.C. § 1344. The permit is an administrative grant of permission for acts described in the company's application, finding they are lawful and may be permit-

ted. If the permit were determined to have issued in error, the company has no right to continue mining under the permit, but must relinquish it. The company's expectation that the permit was issued correctly is simply an expectation and assumption, which does not and cannot bind the Corps to maintain the permit, wrongly issued. *See Bragg*, 54 F.Supp.2d at 665 (The United States is not estopped from taking positions different from those mistakenly taken by its agents on prior occasions.).

This point is further illustrated by the fact that, if the Corps' decision to issue the permit is challenged, the decision is made on the Corps' administrative record and the party defending the permit will be the Corps. It is not the company's "right" to the permit, but the Corps' duty to issue or withhold it that is in question.

Because Beech Fork lacks a legally protected interest related to the subject of this action, the initial factor of *Rule* 19(a) is absent. Accordingly, the Court concludes Beech Fork is not a necessary party and KCA's motion to dismiss for failure to join such a party is **DENIED**.

The Court previously considered extensively the Corps' motion to transfer venue. *See Kentuckians for the Commonwealth v. Rivenburgh*, 204 F.R.D. 301 (2001). KCA adds nothing to the previous discussion. The alternative motion to transfer venue is **DENIED**.

## V. MOTION FOR FURTHER INJUNCTIVE RELIEF

 Plaintiff moved the Court to issue a permanent injunction against the Corp

---

**18.** The term "legally protected interest" is frequently used in discussions of standing. *See e.g. Raines v. Byrd*, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)(For standing purposes, "the alleged injury must be legally and judicially cognizable. This re-

quires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is ... concrete and particularized[.]' ")(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Defendants requiring them to revoke the authorization to MCCC, and its successors or assigns, pursuant to Nationwide permit 21 under the Clean Water Act, 33 U.S.C. § 1344, to dispose of waste rock and dirt, including mining spoil, from surface coal mining activities under Kentucky DSMRE Permit # 880–0135 into waters of the United States.

The existing permanent injunction cannot simply be extended to an individual permit holder. The injunction is deliberately prospective because each permit application requires a factual determination whether fills, where requested, fall under the injunction or have a primary constructive purpose. To determine whether the Corps should be enjoined to revoke MCCC's successor, Beech Fork's permit, a show cause hearing would be necessary.

 As discussed above, Beech Fork recently filed a PCN with the Corps that proposes to re-engineer its existing mine plan to place no spoil in waters of the United States without a constructive primary purpose. The initial question a court must ask on an injunction application is whether there is imminent probable irreparable injury to Plaintiff without the injunction and likely harm to the defendant with a decree. *See Blackwelder*, 550 F.2d at 196. In the absence of injury, the application must be denied. Assuming Beech Fork adheres to its position in the new PCN, an injunction is unnecessary. Accordingly, the Court **DENIES** Plaintiff's motion without prejudice to raise it again if altered circumstances necessitate such action.

## VI. CONCLUSION

Movants' motion for clarification of the permanent injunction issued May 8 is **GRANTED** in part and **DENIED** in part. The permanent injunction is maintained as clarified:

The Corps Defendants are ENJOINED from issuing any further § 404 permits **within the Huntington District** that have no primary purpose or use but the disposal of waste, **except dredged spoil disposal.** In particular, issuance of mountaintop removal overburden valley fill permits solely for waste disposal under § 404 is ENJOINED.

Movants' motion for a stay pending appeal is **DENIED.** KCA's motions to join Beech Fork as a necessary party or, alternatively, for change of venue are **DENIED.** Plaintiff's motion for further injunctive relief is **DENIED** without prejudice.

The Clerk is directed to send a copy of this Order to counsel of record and to publish is on the Court's website at http://www.wvsd.uscourts.gov.